MARGARET WELCH, administratrix, *vs.* NEW YORK, NEW HAVEN, AND HARTFORD RAILROAD COMPANY.

Suffolk.  March 13, 1900. — June 20, 1900.

Present: HOLMES, C. J., KNOWLTON, MORTON, LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Loss of Life — Railroad — Employers' Liability Act — Negligence — Due Care — Evidence — Dependence on Deceased for Support.*

A person stationed in the tower in a railroad yard, whose duty it is to move the switches upon receiving signals and orders from others in the yard, is in "charge or control" of a switch, within the meaning of St. 1887, c. 270, § 1, cl. 3.

If a switchman in the employ of a railroad corporation, engaged in shifting cars in the railroad yard, gives the man stationed in the tower the signal for a certain track by holding up a lantern and also shouting the number of that track, and the latter throws up his hand as a signal that he heard and understood him, and then so turns the switch that the cars are sent upon another track and injure the switchman, in an action for the injury there is evidence of negligence on the part of the tower man to be submitted to the jury.

In this case, which was an action under the employers' liability act, St. 1887, c. 270, as amended by St. 1892, c. 260, for causing the death of the plaintiff's intestate, there was evidence of due care on the part of the intestate which should have been submitted to the jury.

In an action against a railroad corporation for causing the death of a switchman in its employ while engaged in shifting cars in the railroad yard, owing to the negligence of the man stationed in the tower in so turning the switch as to send a train upon a track other than that for which the signal was given, evidence is competent to show that the train was coming much faster than the usual and ordinary rate of speed for cars which were being shifted at that place.

The opinion of a witness, not an expert, as to how far the voice of a switchman, who had shouted a direction to the man in the tower while engaged in shifting

cars in a railroad yard on a stormy night, could be heard in the storm, is properly excluded in an action against the railroad corporation for causing the death of the switchman.

Notice given in the midst of the trial, in an action against a railroad corporation, to produce its written rules, properly may be held to be insufficient to justify the introduction of secondary evidence to prove one of the rules.

The mother of an employee of a railroad corporation who had always lived with her and given her all his wages, which she used in the support of her family, although she also received from her husband and two daughters the wages earned by them, which she used in the same way, may be found to have been dependent on her son for support, within the meaning of St. 1887, c. 270, as amended by St. 1892, c. 260.

TORT, under the employers' liability act, St. 1887, c. 270, as amended by St. 1892, c. 260, to recover for the death of the plaintiff's intestate, Richard Welch, and for conscious suffering consequent upon injuries received while in the employ of the defendant. Trial in the Superior Court, before *Lilley*, J., who allowed a bill of exceptions, in substance as follows.

There was evidence tending to show the following facts: On November 5, 1894, Welch, the plaintiff's intestate, was in the defendant's employ as a switchman, and was one of a gang of men engaged in shifting cars and making up trains in the yard of the Park Square station in Boston. The accident occurred at fifteen minutes past ten o'clock in the evening, and there was a severe snow storm at the time, some of the witnesses testifying that it was the worst of the season. The shifting engine was on the south of the train, and was running back and forth across the Boston and Albany Railroad tracks, placing cars in various parts of the yard. This work was done on track No. 1, the main freight line, and Nos. 7 and 5, which ran off to the right towards Columbus Avenue. The conductor would give directions where he wanted the train to go, and it was the duty of the plaintiff's intestate to watch the conductor and transmit his signal to the head end of the train, and, if a switch was to be thrown, to signal the tower man, who would throw the switches.

A few minutes before the accident, the train then being south of the Boston and Albany Railroad tracks, the conductor told the tower man, in the presence of Welch, to let them in on track No. 1, down straight. Then he went north about four hundred or five hundred feet towards the Park Square station, stopping at a shanty near the tracks, called a switchman's house. At the

"dwarf switch," so called, there were two signals, which stood a foot or a foot and a half above the ground, one of which would show the figure 1, and when reversed the figure 7, and the other the figures 5 and 4, respectively. The switch signals were all iced up and blurred, so that one could not be distinguished from another. The conductor intended to send these cars on to the "rub dub" track, so called, which runs off to the right from track No. 1 about seven hundred feet north of the Boston and Albany Railroad tracks, but he found other cars on this track in his way. His train, which had come north on track No. 1, stopped opposite the switchman's house, and then had to go back across the Boston and Albany Railroad tracks so as to let the cars off of the "rub dub" track. The conductor stayed at the switchman's shanty, and, after his train had gone south of the Boston and Albany Railroad tracks, a train passed out over those tracks. Welch, in the mean time, was down at the brakeman's house near those tracks, almost opposite the tower. After the conductor saw that the "rub dub" track was clear, he held up his light, giving "high ball," which was the signal for his train to come up on track No. 1. He could not tell from the appearance of the switches for which track they were set, or which way the train was to go, but saw that "they got wrong."

When the conductor last saw Welch he was right in front of the brakeman's shanty, near the crossing. His place was there by the crossing, and the only instruction the conductor had given his men at that time was to go up on track No. 1. Welch took this signal, having stepped out of the switch house in which he had been standing, held up his lantern to the tower man, which was the signal for track No. 1, and shouted "On one," which meant "down straight." The tower man threw up his hand, indicating that he understood the signal. The train, which had on a large, powerful engine, backed up over the Boston and Albany Railroad tracks at the rate of fifteen or eighteen miles an hour.

When Welch gave the signal he was right in front of the brakeman's house, which is about six or seven feet from "three-house" track, so called. To go from the shanty to track No. 1 Welch would have to cross "three-house" track, from which

branches the " cattle track," so called, and another track, from which branch other tracks also. The train turned off to the right on " three-house" track, instead of going upon track No. 1, and Welch was found lying between " three-house" track and the " cattle track," about sixty feet north of the brakeman's shanty, having received injuries which resulted in his death.

The conductor of the train testified, on cross-examination, that the movements which were to be made with the cars were entirely under the control of the men on the ground, and all that the man in the tower had to do was to make the movements, by throwing his lever, required to carry out the signals and orders given him by the conductor or the switchman.

A witness for the plaintiff, who was a brakeman on the train in question, after stating that Welch held up a green light, which was used to signal the tower man and the train men, as a signal to the tower man for track No. 1, and shouted " On one," testified that Welch " had a good, strong voice, and always used it to the full extent." The witness was then asked, " On that night, in such a storm, how far could his voice be heard?" The judge excluded this question; and the plaintiff excepted.

One. Maroney, a witness called by the plaintiff, testified that on the day of the accident he was working for the defendant in the night-shifting gang, in which Welch was switchman. He was then asked the following question: " How did the rate of speed at which the train was backing at the time Welch was struck, or at the time the train was by the switchman's shanty, compare with the usual or ordinary speed at which trains were shifted at the place and for the purpose?" This question was objected to and excluded; and the plaintiff excepted.

The witness having testified that the train was going at the rate of fifteen or eighteen miles an hour at the time the plaintiff's intestate was killed, was asked the following questions: " Was this the usual rate of speed for cars to be shifted in that yard? Was it a safe rate of speed in that yard at that time and place?" Each question was objected to and excluded; and the plaintiff excepted.

One Hoffman, who was the conductor of the train in question, testified that there were rules with reference to the rate of speed at which cars should be run in the freight yard; that they used

to have a private book for them, and he knew what they were, and that he had worked in the yards for two and a half years. He was then asked the following question: "From your general knowledge as a brakeman and conductor in those yards, do you know the rate of speed that cars are allowed to run in those yards?" and the plaintiff offered to show that the witness did know the rate of speed. The judge excluded this question; and the plaintiff excepted.

The witness further testified that he did not have that book with him.

The plaintiff's counsel then asked the defendant to produce the rules which governed the rate of speed of cars at that time. The defendant's counsel answered that on the Saturday preceding the trial, which was on Monday, he made an examination of the defendant's rules for the purpose of finding if there was any such rule, and could not find any.

The witness was then asked, "Do you know whether there was any such rule, or was at that time?" to which he answered, "There was at that time."

The following question was then put to the witness: "What was the written rule on the defendant's road at that time as to the rate of speed at which cars should be driven in shifting in that yard?"

The defendant's counsel objected to the question, contending that no foundation for secondary evidence had been laid. The judge so ruled, and excluded the question; and the plaintiff excepted.

The plaintiff testified that she was the mother of Richard Welch, her intestate, who was about twenty-seven years old at the time of his death; that he was not married, and had always lived with her; that he always gave his wages to her, and she spent the money on her family and her house for any purpose that she needed to use it; and that her husband was earning $1.25 a day, which he gave to her, and she spent the money so received on the house and the family. On cross-examination, she testified that, before her son's death her two daughters earned together from $8.50 to $10.50 a week, which was also given to her and used for the support of the family.

John Welch, called as a witness by the plaintiff, testified that

he was her husband and the father of Richard Welch; that he had worked for the defendant since 1872, and at the time of his son's death was earning $1.25 a day, and that this money he gave to his wife to support his family with, and to pay for his house.

There was evidence that the plaintiff's intestate consciously suffered after he was injured.

At the close of the evidence the judge, at the request of the defendant, directed the jury to return a verdict for the defendant; and the plaintiff alleged exceptions.

The case was argued at the bar in March, 1900, and afterwards was submitted on briefs to all the justices.

*S. A. Fuller & G. W. Anderson,* for the plaintiff.

*C. F. Choate, Jr.,* for the defendant.

KNOWLTON, J. The principal questions in this case are, whether there was evidence of negligence on the part of the defendant or of any of its servants, and whether there was evidence of due care on the part of the plaintiff's intestate.

We think it plain that the tower man, whose duty it was to move the switch, was a person in "charge or control of . . . any switch" within the meaning of St. 1887, c. 270, § 1, cl. 3. Even if another person gave him directions or exercised supervision over him in such a way as to be in charge of the switch in a broad sense, so that the railroad company might be liable for his negligence in giving or failing to give proper directions, we are of opinion that, situated in the tower as he was, having complete manual control of the switch after receiving signals and orders from one below, his control and charge for the time were of a kind contemplated by the framers of the statute. There was testimony that Welch, the plaintiff's intestate, had a green light which was used to signal the tower man and the train men, and that the signal for track No. 1 was simply to hold it up. A witness testified that he saw Welch give the signal for track No. 1 to the tower man by holding up his lantern and shouting, "On one," and that he saw the tower man throw up his hand as a signal that he heard. Then, instead of setting the switch for track No. 1, the tower man switched the train on "three-house" track. The action of the tower man in throwing up his hand was an indication that he understood the signal that had been given him, and his further action in moving the switch

was equivalent to a representation that he had received the signal and understood it.   The testimony of the witness tended to show that by the motion of his lantern Welch gave the recognized signal for track No. 1, and that he added a shout to the same effect.   The jury might have found that the tower man was negligent in acting at all if he did not see and understand the signal, or in setting the switches wrongly if he did understand it.   They might have found that the signal was given in such a way that it was negligence in him not to understand it correctly.   His turning the switch in such a way as to send the train on the wrong track was the direct cause of the accident, and we are of opinion that there was evidence for the jury on this part of the plaintiff's case.

Although Welch was a switchman whose station was at the switches just southerly of the place where he was killed, we do not understand from the evidence that it was his duty to be all the time just at these switches, but only in such close proximity to them as to be able to receive and give signals, and to do the other duties connected with his position.   There was a brakeman's house near by which was intended for his use, and we see nothing to indicate that there was any failure on his part to do his duty properly, or any lack of care up to the time that he came out of the brakeman's house and stepped upon the track where he was struck by the train.   It does not appear that it was any part of his duty, when the tower man turned his switch, to examine the dwarf switch signals which stood a foot or a foot and a half above the ground to see if the tower man had turned the switch rightly.   The evidence was that at the time of the accident these signals were so covered with snow and ice that it was very difficult, if not impossible, to read them.   Of course, if at any time he saw a dwarf signal which showed that the tower man had made a mistake, he would endeavor to correct the mistake.   A terrible snow storm was then raging, which some of the witnesses said was the worst of the season.   We are of opinion that it was a question of fact for the jury whether, under the circumstances, it was his duty to go to the dwarf signals and clean off the snow and ice to see if the tower man had made a mistake.   It seems that he was in the performance of his duty in walking away from the brakeman's house across and along the

tracks to a place where he could readily receive and give signals or do anything else that ought to be done while the cars were being put in their intended position, although he was not then going towards the switches.   Unless he was negligent in not looking at the approaching cars and discovering that they were on the wrong track in time to escape them, there seems to be nothing to control the natural inference from his conduct that he was in the exercise of due care.   If the train had been on the track where he had every reason to believe that it was coming, he could not have been injured.   With the arrangement of cars on the other tracks as he had just seen them, it was impossible for the train to come on the track where he was walking while the train for which he had given the signal was being switched to track No. 1. He had every reason to suppose that he was in a place of perfect safety.   Nothing but the failure of the tower man properly to execute the order which had just been given him could expose him to danger in the place where he was walking between "three-house" track and the cattle track.   The jury might well find that a man in the exercise of ordinary care, who had just given a signal to a tower man to send back a train of cars on track No. 1, and who had received from the tower man a response in acknowledgment of the signal, and who knew that no other train could come upon the "three-house" track or the cattle track while the train was being switched upon track No. 1, would think it safe to walk between these two tracks in the belief that the train was being switched in accordance with the signal.   In connection with the other facts, the inclemency of the weather was a circumstance of some importance.   We think there was evidence of due care on the part of the plaintiff's intestate which should have been submitted to the jury.

Upon the question whether Welch was in the exercise of due care, we are of opinion that it was competent for the plaintiff to show that the train was coming much faster than the usual and ordinary rate of speed for cars which were being shifted at that place.

There was no error in the exclusion of the opinion of the witness as to how far Welch's voice could be heard in the storm.   The witness was not an expert, and upon a full statement of the conditions the jury could judge whether Welch could have been heard by the tower man.

The judge might well hold that the notice given to the defendant to produce its written rules was insufficient to justify the introduction of secondary evidence.

Although it does not clearly appear how far, if at all, the plaintiff was dependent upon her son for support, there was evidence that for a long time he had given her all his wages, and there was testimony from which the jury might have found that she needed the money to obtain the necessaries of life, beyond that which her husband could furnish, and that she was dependent on this son for support within the meaning of the statute.   See *McCarthy* v. *New England Order of Protection,* 153 Mass. 314; *Daly* v. *New Jersey Steel & Iron Co.* 155 Mass. 1, 5; *Houlihan* v. *Connecticut River Railroad,* 164 Mass. 555.

*Exceptions sustained.*