MARGARET WELCH, administratrix, *vs.* NEW YORK, NEW
HAVEN, AND HARTFORD RAILROAD COMPANY.

Suffolk.   March 12, 1902. — September 2, 1902.

Present: HOLMES, C. J., KNOWLTON, MORTON, HAMMOND, & LORING, JJ.

*Negligence,* Contributory, On railroad.  *Employers' Liability Act,* Dependent for
support under.  *Evidence,* Competency, to show death, in rebuttal.

By a decision reported in 176 Mass. 393, this court held, that at the first trial of
this case, where a verdict was ordered for the defendant, there was evidence of
due care on the part of the plaintiff's intestate, and it is now held, that the same
is true upon the evidence as presented at the new trial which took place after
that decision.   The plaintiff's intestate was a switchman employed by the de-
fendant and was run over and killed on a dark stormy night in consequence of
the mistake of a tower man in turning a freight train upon the wrong track.  At
the first trial there was evidence that the intestate gave the right signal with
his lantern as well as by calling to the tower man, and that the tower man ac-
knowledged the order by a motion of his hand.   At the new trial there was on
this point merely evidence that the intestate gave the right signal to the tower
man by calling out the number of the track on which the train should have
gone.   The tower man testified that he got the signal from the intestate, but
that it was for the wrong track on which he turned the train.   *Held,* that on the
evidence in the case the jury could have found that the intestate had a right to
assume that the tower man heard his signal, that if the tower man had made
the usual motion in acknowledgment, it would not have indicated that he un-
derstood the signal but merely that he had got some signal, that the jury could
have found that the tower man heard the signal and then threw the wrong
switch by mistake and that the intestate had the right to assume that no train
would come upon the track where he was struck and killed.

Evidence, that a switching train in a freight yard was running at the rate of from
eighteen to twenty miles an hour and that the usual rate of speed at that place
was six miles an hour, is evidence of negligence on the part of the railroad com-
pany as against a brakeman employed in the yard.

In an action, by the mother and administratrix of an intestate under St. 1887, c. 270,
as amended by St. 1892, c. 260, for the conscious suffering and death of the in-
testate, the jury gave a verdict for the plaintiff of $4,000, apportioned $500 to
the plaintiff as the legal representative of the deceased, and $3,500 to the father
of the deceased and husband of the plaintiff " who at the time of the death of
the deceased was next of kin, and dependent upon the wages of said deceased
for support."   It appeared, that the intestate, who was twenty years of age, had
been in the habit of giving substantially all his wages to his mother, and that
she used them for the support of the family consisting of the father and mother
and seven children including the intestate, that the father was earning $1.25 a
day, and that he also gave his wages to his wife, the intestate's mother, except
what was necessary to pay the water rates and taxes on the house the family
lived in, and $10.10 a month toward paying for the house, which was bought on

the instalment plan for from twelve to fourteen hundred dollars and partially paid for. The expenses of the family, including food and clothing of some of the children, were paid for by the mother out of the combined earnings of the father and son and of two daughters when they had work. *Held,* that on these facts the father could be found to have been dependent on the intestate, as the jury could have found that the mother acted for the father in receiving and expending his wages and those of his minor children. *Held, also,* that the father properly might testify, that he took out $10.10 a month to pay the instalments due on the house, this evidence being competent to prove how all the money put in the common purse was expended.

Where it is material to show that a certain person is dead, a witness may testify that "from general repute" he knew that he was dead, if afterwards it is shown by another witness that the report of the death was brought home to the family of the deceased.

In an action under St. 1887, c. 270, as amended by St. 1892, c. 260, for the death of the plaintiff's intestate, a brakeman in a freight yard, run over and killed by a freight train of the defendant, the plaintiff called as a witness the conductor of the freight train. On cross-examination this witness was shown what purported to be a report of the accident with the witness's name written on the back of it. The report stated that the train was going five miles an hour. The witness denied that the report was his, and at first admitted and afterwards denied that the signature was his. Later, called by the plaintiff in rebuttal, this witness was allowed to testify that neither the report nor the signature was his, that it was his duty to make out a report in his own handwriting, and that in the report which he did make out he had stated that the train was going from eighteen to twenty miles an hour. *Held,* that the evidence was competent, and that its admission in rebuttal was within the discretion of the presiding judge.

TORT, under St. 1887, c. 270, as amended by St. 1892, c. 260, by the mother and administratrix of Richard Welch, a freight brakeman, for the conscious suffering and death of the plaintiff's intestate from being run over by a train switched by mistake upon the wrong track in the defendant's Park Square freight yard in Boston. Writ dated July 18, 1895.

At the first trial of the case in the Superior Court *Lilley,* J. ordered a verdict for the defendant, and the plaintiff alleged exceptions which were sustained by this court in a decision reported in 176 Mass. 393. At the new trial in the Superior Court *Richardson,* J. refused to order a verdict for the defendant. The jury returned a verdict for the plaintiff in the sum of $4,000, apportioned as stated in the opinion; and the defendant alleged exceptions.

One Guilfoyle, a witness for the plaintiff, was working as brakeman upon the night of the accident in the same crew with Welch. As to whether Welch swung his lantern as well as called out when he gave the signal to the tower man, Guilfoyle

at the second trial testified as follows: "From where I was sitting I could see the tower. It was lighted. — Q. What could you see in the tower? A. All I seen was this motion. — Q. You saw the motion by whom? A. By the tower man. — Q. What was it. A. I could n't tell you who it was. — Q. When Welch called, as you described, to the man in the tower, what was he doing? A. He was standing there at the time Welch made the motion, called, and heard him holler. — Q. Did he give a motion? A. I don't know whether he gave a motion or not. I didn't see that motion. I don't remember, seven years is a good while ago. I don't remember everything that happened; I am trying to give it now, to the best of my ability. If there is anything there [referring to his testimony at the previous trial] that I am contradicting now in that other testimony, that other testimony ought to stand."

One Hoffman, the conductor in charge of the switching train that ran down Welch, was called by the plaintiff as a witness. His cross-examination in regard to the report of the accident made by him to the defendant was as follows: "Q. Did you make a report about this accident? A. I certainly did. — Q. You said something about the speed that train was going at, did n't you? A. Yes, sir. — Q. Is that the report? [Paper handed to witness.] A. No, that is n't my report. — Q. Well, is that your signature on the back? A. That is my signature on it, but it is n't my report. — Q. You signed it? A. I signed it. — Q. And in that report did n't you say the train was going about five miles an hour? A. No, sir; that don't go. — Q. That don't go? A. No, sir; they were going different. — Mr. Fuller. Let me see that. — Q. Now, you say that is your handwriting on the back of that paper, "Fred H. Hoffman, yard conductor"? A. No, sir; that is n't my writing. — Q. You just said it was, did n't you? A. Well, it ain't. — Q. What made you say it was? A. I just looked at it. — Q. Now, I want you to look at that report which you said a minute ago you signed, and see if it does n't say that the train was going five miles an hour."

Mr. Choate read the report, which contained a statement that the speed of the train at the time of the accident was about five miles an hour.

The same witness, called by the plaintiff in rebuttal, testified,

A reduced copy of a plan of the freight yard in which the accident occurred. Each track is indicated by a single line.

that "the report shown him was not his; that it was not his signature upon the report; and that he stated in the report how fast the train was going." " *Q.* You did give them a written report in your own handwriting? *A.* Yes, sir; I did. — *Q.* Is it the duty of the conductor to do that, to make them out in his own handwriting. *A.* Yes, sir. — *Q.* Did you make any statement in your report as to how fast the cars were going? *A.* I certainly did. — *Q.* And what did you report as to the speed of the cars? *A.* Making eighteen to twenty miles an hour." The last two questions and answers were excepted to by the defendant.

*C. F. Choate, Jr.,* for the defendant.

*S. A. Fuller,* for the plaintiff.

LORING, J. This case comes here on exceptions taken by the defendant at the new trial which took place after the decision of the court reported in 176 Mass. 393.

The defendant's first contention is that the evidence as to the due care of the intestate was materially different at the second trial, and that although there was evidence of due care on his part at the first trial there was none here.

The intestate was the switchman of the crew of a switching engine used in the freight yard of the defendant at Park Square in Boston. The accident occurred during the night of November 5, 1894. The crew had been engaged in taking cars which had been unloaded at No. 3 freight house, and delivering them elsewhere to be loaded. Just before the accident the switching engine with some cars, testified by some to be seven, by others ten, had pulled out of "Three House" track and pushed up on No. 1 track, intending to deliver some of these cars on track No. 12. It appeared from the testimony of the conductor that he called to the motorman of the interlocking tower to let the train down on "Number 1" track, and gave a signal with his lantern to the same effect; and that this order was acknowledged by the tower man by a motion of his hand. The conductor then walked to the switchman's house, some four hundred or five hundred feet from the interlocking tower, to see if No. 12 track was clear. He found that it was not; he then motioned his train to back down south of the Boston and Albany crossing until he gave a motion to kick in the cars to be left

on track No. 12, intending to wait until the train on No. 12 track got out of his way. It also appeared that when the engine with its cars got south of the Boston and Albany Railroad cross-over the interlocking signal was set against the defendant's tracks, and the engine with its cars had to wait until a Boston and Albany train had gone by.

The jury could have found from the testimony of the tower man that Welch was present when the conductor gave the order to the tower man to let the engine and cars down on track one. The train stayed south of the Boston and Albany crossing about five or six minutes. It then received an order from the conductor, transmitted to the engineer by one of the brakemen, to kick the cars or some of the cars back, and Welch, who had been in the brakeman's house, stepped out and called to the tower man. The tower man testified that Welch called "On Three House, Jimmie," but one of the brakemen, who had been changing his stockings in the brakeman's house during the five or six minutes the train was waiting south of the Boston and Albany crossing, testified that Welch called out "Number 1," and this was corroborated by the brakeman Ames, who transmitted the order to kick the cars off.

There was testimony at the former trial that Welch gave a motion with his lantern as well as that he called to the tower man, and that the tower man acknowledged the order by a motion of his hand; and it is the absence of this testimony at the second trial on which the defendant particularly relies in his contention that there was no evidence of due care on Welch's part.

What happened was this: The tower man set the switch for Three-House track, the engine kicked the cars back and ran over Welch, who was picked up about sixty feet north of the brakeman's house, on track No. 3. It appeared that Welch had taken shelter in the brakeman's house while the train was waiting south of the Boston and Albany cross-over, and that after he gave the order to the tower man he stepped back into the house for some purpose like putting the cover on the stove, and then stepped out. No one saw what he did after he stepped out.

The night was a stormy one; snow was falling; one of the witnesses testified that it was "very stormy; a heavy storm."

It appeared that tracks 5 and 6 were full of cars, and for that

reason Welch had to go out to No. 1 track to get signals from the conductor at the switchman's shanty at the north end of the yard. There was evidence from which the jury might have found that Welch was struck at the frog immediately opposite the brakeman's house, although his body was finally found sixty feet further north. If he was struck there he was in the direct path to No. 1 track, where he had to go to take signals from the conductor.

The defendant contends that Welch was bound to look out for himself since he was in a railroad yard where cars were passing up and down all the time and in every direction. But if the tower man got Welch's signal in confirmation of the conductor's signal previously given, Welch had a right to assume that no train would come down on Three House track. We are of opinion that the jury could have found that Welch had a right to assume that the tower man heard his signal. The tower man testified that he got a signal from Welch; if he had made the motion usually made in acknowledgment, it would not have indicated that he understood the signal but merely that he had got some signal. In this case the jury could have found that the tower man heard the signal and then threw the wrong switch by mistake. One witness testified that Welch could have been heard ordinarily seven hundred feet away; the tower was less than one hundred and fifty feet away, and there was nothing to prevent Welch's being heard but the storm. We are of opinion therefore that the jury could have found that Welch was in the exercise of due care within the doctrine of *Maguire* v. *Fitchburg Railroad*, 146 Mass. 379, relied on by the defendant.

The defendant's other contention on this behalf is that it was the duty of Welch to see that the switch was set right by the tower man. We do not think that we can rule as matter of law that it was the duty of this employee to go to the dwarf signal and rub off the snow to see if the switch was rightly set each time it was set by the tower man.

We are of opinion that there was evidence that the train was going at eighteen to twenty miles an hour; and Long testified that the usual rate of speed was six miles an hour. The jury were warranted in finding that six miles an hour was the usual rate of speed, in spite of his cross-examination, in which he said

that "sometimes" the switching engines went slower and sometimes faster, depending on circumstances.

It appears from the bill of exceptions that "The jury found for the plaintiff, and assessed damages in the sum of $4,000, the same being the total damages awarded both for the death of the plaintiff's intestate and the injury which caused his death, which said damages the jury apportioned as follows: $500 to the plaintiff as the legal representative of the deceased, and $3,500 to the father, John Welch, who at the time of the death of the deceased was next of kin, and dependent upon the wages of said deceased for support."

It appeared that the intestate, who was twenty years of age, had been in the habit of giving substantially all his wages to his mother, and that she used them for the support of the family, consisting of the father, mother and seven children, including the intestate; it further appeared that the father was earning $1.25 a day, and that he also gave his wife, the intestate's mother, his wages, except what was necessary to pay the water rates and taxes on the house the family lived in, and $10.10 a month toward paying for the house, which was bought on the instalment plan and which cost from $1,200 to $1,400 and was partially paid for. The expenses of the family, including food and the clothing of some of the children, were paid for by the mother out of the combined earnings of father and son, and of two daughters when they had work. The defendant's contention is that the persons dependent on the father were dependent on the intestate, but that the father was not, because the earnings of the intestate were not in fact given to him and had not been used by him. We are of opinion that the jury could have found that the mother acted for the father in receiving and expending his wages and those of his minor children.

The next exception was to the admission of evidence. The plaintiff was allowed, against the objection of the defendant, to introduce, as evidence of the death of one Ames, a witness at the former trial, whose testimony was introduced as the testimony of one deceased, that he knew "from general repute" that he was dead. Had there been no further testimony the case would come within *Blaisdell* v. *Bickum*, 139 Mass. 250, in which it was held that general report not brought to the knowl-

edge of the family is not competent evidence of death. In the case at bar, it was subsequently shown by another witness that the report of the witness's death was brought home to the family of the deceased. We think that that removes the objection although the evidence was not admitted *de bene.*

The defendant objected to the father's testifying how much he had paid on the house the family lived in and which Welch's mother had testified had been bought on the instalment plan ; the father testified that he took out $10.10 a month to pay the instalments due. No ruling was requested as to whether this expenditure precluded the father's claim that he was dependent on the son. We are of opinion that it was competent to prove how all the money put in the common purse was expended.

The conductor of the train, called as a witness on cross-examination by the defendant, had denied that a report introduced by the defendant as his report of the accident was written by him, and at first admitted and afterwards denied that the signature on the back was his.

When called by the plaintiff in rebuttal this witness was allowed to testify that this report was not his and the signature was not his; that it was his duty to make out a report in his own handwriting; and he was then allowed to testify, against the defendant's objection, that in the report which he did make out he stated how fast the train was going and that it was going at the rate of eighteen to twenty miles an hour. In the report produced by the defendant the speed was stated to be five miles an hour. We are of opinion that it was competent for the presiding judge in his discretion to allow the plaintiff to put in this evidence in rebuttal as to the report put in by the defendant as the report of the witness. As the defendant had produced the report in evidence as the report made by the witness and the witness had denied that it was his, it would have been idle to require the plaintiff to notify the defendant to produce the report made by the witness as the foundation for secondary evidence of its contents. On the defendant's introducing evidence of a statement made by the witness, it was competent for the plaintiff to show that that statement was not made by him, and in that connection what the statement made by him was.

*Exceptions overruled.*