CHARLOTTE H. RICHELIEU, ADMINISTRATRIX, APPELLEE, v. UNION PACIFIC RAILROAD COMPANY, APPELLANT.

FILED DECEMBER 4, 1914. No. 17,660.

1. Master and Servant: DEATH OF SERVANT: EMPLOYERS' LIABILITY ACT: "DEPENDENT." Under section 1, ch. 149, pt. 1, 35 U. S. St. at Large, a sister of the decedent, who sues as administratrix of the estate, and upon the trial establishes that the decedent contributed to her support by the gift of money, by the payment of her board, and otherwise, will be considered a dependent, and entitled to recover damages because of the injury suffered, even though possessed of property and having a clerical position which in part supports her.

Richelieu v. Union P. R. Co.

2. **New Trial: Continuance: Abuse of Discretion.**   Where the district court refused to allow the defendant a continuance, and the defendant was thereby prevented from presenting its theory of its defense to the court and jury, and was denied a fair trial, the action of the court will be deemed to be an abuse of discretion, for which a new trial will be granted.   Laws 1911, ch. 39, sec. 1.

APPEAL from the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE.   *Reversed.*

*Edson Rich* and *John A. Sheean,* for appellant.

*Nelson C. Pratt, contra.*

HAMER, J.

Under the federal employers' liability act (35 U. S. St. at Large, pt. 1, ch. 149, sec. 1), the plaintiff, as administratrix of the estate of Harry E. Richelieu, deceased, sued the defendant, the Union Pacific Railroad Company, in the district court for Douglas county to recover damages for the death of her brother, alleged to have been caused by the negligence of the company.   There was a verdict in her favor of $12,000, and, on an order of the court in overruling the motion for a new trial, the plaintiff remitted from $12,000 down to $8,000, and a judgment was rendered for the latter sum against the defendant, and the defendant appeals.

The deceased was one of a crew of six men operating local freight train No. 57, west-bound between Council Bluffs, Iowa, and Columbus, Nebraska.   On this run it was customary for the members of the crew, while at Waterloo, to consider what work was to be done at Valley, and it was the intention of the crew, while on this particular run, to transfer a certain flat car occupying a position next to the engine to the rear end of the train, immediately in front of the caboose, and to place a private car, standing at the depot east of Valley, onto the extreme end of the train.   As the train passed the depot at Valley on the west-bound main line and entered the station from the east, Justison, the rear brakeman, got out on the platform of the caboose or way car, and uncoupled it from the train,

and brought it to a stop about opposite the depot. The main train continued west past the cut-off switch leading to the passing track on the north. Boynton, who had been on the engine since leaving Waterloo, dropped off on the ground, alighting opposite the station, for the purpose of securing from the agent there the switching list. Richelieu got off at a point further west to let the train in on the north passing track. The cut-off switch was thrown by Richelieu, and he then walked down to the next switch further east, which connected up with the passing track proper, and threw that switch also. Boynton passed back of the train, and while with Richelieu directed him to throw the switch on the passing track. The train was then shoved in on the passing track, and while it was backing up Boynton told Richelieu what the conductor had said was to be done. While the train was moving slowly eastward, Richelieu stepped between the first and second cars from the engine and turned an angle cock off on the train with his right hand, and then turned it off on the left on the flat car with the same hand, and at the same time he reached for the pin-lifter, and after taking a few steps, perhaps not more than six feet, he stepped from between the cars and stepped down into the frog with his left foot, and the wheel had his foot almost instantly. The train appears to have been moving about two miles an hour, and it went about twelve feet after the engineer commenced to apply the emergency brake. The wheels of the car ran over Richelieu's left leg and arm.

It is contended that the frog over which Richelieu was compelled to go to perform the duties of uncoupling the cars was not properly blocked, and that the defendant would have been free from harm but for the defective condition of the frog. There is some evidence tending to show that the frog had previously been blocked, but that it had worn out. We are confronted with the question as to whether the defendant was permitted to submit to the jury its theory of the case. Unless the frog was in such condition when the deceased stepped out from between

Richelieu v. Union P. R. Co.

the cars that it caught his foot and held him, there is no liability.

The bill of exceptions shows that, to permit argument of counsel, the jury were excused until 9:30 A. M. Monday, May 29, 1911, at which time the following proceedings were had: "The court: The motion to direct a verdict is over-ruled. To which ruling the defendant excepts. The court: The court having intimated to counsel during the trial of the case, or after the plaintiff had introduced her proof, that it was apparent to the court that the only question that would be submitted to the jury would be the question of the negligent order of the conductor or the man in charge of the train, and the court being now of the opinion that the court should submit *the defective condition of the track,* together with the orders made by the conductor or the man in charge of the train, and the court *having surprised counsel for the defendant, the court now offers to open up the case and give the defendant two days to produce any evidence* defendant may have as to whether or not the unblocked switch was defective and dangerous, considering the orders that were made by the conductor or man in charge of the train, and the character and nature of the work that was required to be done by the deceased." To the foregoing offer there was a response by Mr. Sheean. The defendant claimed surprise because at the conclusion of plaintiff's case, and after the motion to direct a verdict on the part of the defendant was made, the court permitted the plaintiff to open up its case for the purpose of amending *its petition to allege a negligent order,* and, if they deem fit, introduce testimony showing negligence in the giving of an order of that character, and ruled that there was no other issue to submit to the jury. The defendant was then prepared with witnesses coming from Denver and other points to maintain the proposition that there was no question of negligence to go to the jury as to the condition of the frog in question, and "by reason of the intimation made by the court along the lines above suggested this defendant introduced no testimony along that line and permitted its witnesses to return home; that the defend-

ant is now unprepared to introduce this testimony, and will not be able to do so by day after tomorrow, which is Wednesday." The response further gives as a reason for the continuance that the witnesses reside at distant points; that the affiant is himself engaged to try other cases for the Union Pacific Railroad set for hearing on May 31, and also on June 2. The response of Mr. Sheean is supported by Mr. Sheean's affidavit that he had the sole charge of the case, being the only attorney representing the railroad company who is familiar with the details of the case; that defendant made elaborate preparations to meet the issues presented in the original pleadings; that the pleadings contain only the allegation that defendant was negligent in maintaining an unblocked frog, and that it was the custom of said defendant to maintain its frogs in a blocked condition, and that therefore the said defendant was responsible to the plaintiff; that the court stated and gave this defendant to believe that on this particular feature of the case the motion would be sustained, and the question as to whether or not the maintenance of the frog could be considered as negligence would be withdrawn from the jury. In passing upon the motion, however, the court intimated that there might be a question of fact as to whether or not there was a *negligent order given by the witness Boynton,* representing the master, to the decedent, Richelieu, but the consideration of this *particular feature* of the motion was left open until the *close of the case;* that the defendant, relying on this position assumed by the court, introduced evidence only on the question of whether or not there was a dangerous place at the point where the injury occurred, and whether or not there were circumstances justifying the proposition that there might be negligence in the giving of the directions by Boynton to Richelieu in the disposition of the train at Valley; that this testimony on the part of defendant took less than an hour to introduce, whereas such defendant had made preparations to introduce testimony as to the negligence of the defendant in maintaining the frog as contended, said defendant having witnesses from Denver and other distant

points to substantiate the proposition that there was no
negligence in this record; that, upon the position taken
by the court in leading the defendant to believe that this
issue would be withdrawn from the jury, these witnesses
were permitted to return to their homes; that the defend-
ant had this very frog itself removed from the tracks at
Valley and shipped to Omaha for the purpose of introduc-
ing it as an exhibit in this case, and, acting upon the assur-
ance of the court, testimony of the defendant was limited
to the question of a negligent order, and the witnesses
aforesaid were permitted to leave on this assurance, and
the frog in question, not being any longer needed, *on the
issue of a negligent order,* was returned; that the case was
finally closed, and this defendant renewed its motion and
directed its argument and cited authorities to the single
proposition of whether or not there was a question of fact
to be submitted to the jury as to the presence in the case
of a negligent order; that the consideration of the mo-
tion was postponed from Friday, May 26, to this A. M.,
Monday, May 29, 1911, when the court intimated that he
found no facts to submit to the jury on a negligent order,
*but had concluded to send the case to the jury on the ques-
tion of whether or not the maintaining of the frog in an
unblocked condition was negligent.* It is further set up in
the affidavit that the defendant's witnesses, naming some
of them, live at distant points; that their testimony is
material, "under the theory as now adopted by the court,
*  *  * and the defendant cannot safely proceed to trial
under the new issues now injected into the lawsuit." The
affidavit also alleged that the affiant is counsel for the
Union Pacific in a case to be tried on the 31st of May, 1911,
before Judge Hanna, at Greeley Center, Nebraska, and in
another case to be tried June 2, before Judge Grimes, at
Lexington; that both these cases required technical knowl-
edge with reference to laws passed by congress affecting
Union Pacific Railroad property and involving the width
of its right of way, and not possessed by other counsel em-
ployed by the company, and that it is impossible for affiant
to try the case on Wednesday.

In opposition to the contention of Mr. Sheean and his affidavit, there is the affidavit of Mr. Nelson C. Pratt, the attorney for the plaintiff, but the matters for which he contends do not seem to justify the ruling of the court in denying the continuance. It would seem from Judge Sutton's statement that he changed his views 'during the progress of the trial, and that he concluded that the alleged defective condition of the track was material, and for that reason he offered "to open up the case and give the defendant *two days* to produce any evidence 'defendant may have as to whether or not the unblocked switch was defective and dangerous, considering the orders that were made by the conductor or man in charge of the train, and the character and nature of the work that was required to be done by deceased." This leads to the conclusion that there *was* a change in the policy of the court, and, if the defendant actually had witnesses touching this question and they were ready to testify to these material matters and to testify in favor of the defendant, then the defendant suffered because of the refusal of the court to continue the case. The trial judge thought this change sufficiently material, so that the defendant should be allowed to produce its witnesses, and therefore he made the offer. The questions whether the defendant had adopted the custom of blocking frogs and had caused them all to be blocked in the yards at Valley, and whether it had allowed this particular frog where the accident occurred to become defective, so that such defective condition was the proximate cause of the injuries, were important questions, and the parties should have been allowed a full investigation.

Section 1, ch. 39, laws 1911, provides the grounds upon which a continuance shall be granted in the district court: (1) The motion shall set out the grounds on which the application is made. (2) It shall be supported by the affidavit or affidavits of persons competent to testify as witnesses. (3) The adverse party shall have the right to file counter-affidavits. (4) Upon obtaining leave of the court either party may introduce oral evidence. (5) There shall be no reversal by the supreme court on ac-

count of the action of the lower court in granting or re-
fusing such application except "when there has been an
*abuse of a sound legal discretion.*"   As the witnesses had
been permitted to separate and had returned to their homes,
many miles distant from the place of the trial, it hardly
seems practicable that they could have been secured upon
the short notice of only *two days*.   We believe the denial
of the continuance to have been an abuse of a sound legal
discretion.   If there had been no showing that the de-
fendant expected to be able to procure the attendance of
the witnesses, there would have been no error in refus-
ing the continuance, and the contrary must be true where
a showing is made as in this case.   *Johnson v. Dinsmore,*
11 Neb. 391.   In that case this court endeavored to lay
down a rule as follows:   "It is said that an application for
a continuance is addressed to the sound discretion of the
court, and that its action thereon *cannot be reviewed.*
But this is stating the rule too broadly.   The object of
the law is to administer justice, and where it clearly ap-
pears from all the facts and circumstances in the case
that there has been an abuse of discretion operating to
the prejudice of the party in the final determination of the
case, the court, in a proper case, will grant a new trial.
If it were not so, a party might be entirely defeated in
his cause of action or defense for the lack of material testi-
mony, which a continuance would enable him to procure."

Was the plaintiff dependent upon the deceased?   She
was 34 years old at the time of the accident, and was the
owner of the old home in which the family had lived.   While
she got $1,000 in money from her father's estate, she ex-
pended it in fixing up this place.   She had a total of about
$5,000 in money in addition to the homestead.   She rented
the homestead for $30 a month, but out of this there were
some expenses to pay, including taxes and water rent.   At
the time of her brother's death she was working for Dr.
Lemere, for whom she began to work in 1909.   She at first
earned $5 a week, but was getting $9 a week when the
brother died.   She had worked 20 months in the doctor's
office.   The brother lived with her in the old house, giving

her an amount of money each month which was somewhat uncertain, but about $30 to $40. He also paid her board while she kept the house. They ate at the sister's next door. "Q. Who paid for your board? A. My brother Harry, and then he gave me $35 or $40 besides paying my board. * * * Q. What else, if anything, did he do for you in the way of maintaining you, besides giving you the money, Miss Richelieu? A. Why, if I would get a new dress he would help me pay for it. If I wanted a dollar at any time he would give it to me. * * * We lived there together and he paid the gas bill and telephone. * * * Q. Did he give you money to buy your clothes with? A. All the time; yes, sir. * * * Q. Now, how was your health then, and how is it now, Miss Richelieu? A. Well, I have never been very strong. Up to the time I was 18 years old they were afraid to have me even wipe the dishes. Q. Have you an impediment in your speech that affects your getting a position? A. I have. Up to the time I was 16 I could not move my tongue when I spoke. Q. And you have an impediment in your speech now? A. I have."

That her brother gave her substantial assistance is apparent from this testimony. She had a home and also about $5,000 in money, and she had a position which paid her $9 a week. She was dependent upon the assistance of her brother, although not without means. She could recover her pecuniary loss only. *Michigan C. R. Co. v. Vreeland*, 227 U. S. 59; *American R. Co. of Porto Rico v. Didricksen*, 227 U. S. 145; *Gulf, C. & S. F. R. Co. v. McGinnis*, 228 U. S. 173. In *Gulf, C. & S. F. R. Co. v. McGinnis*, it was said in the syllabus: "The employers' liability act of 1908, as heretofore construed by this court, is intended only to compensate the surviving relatives of a deceased employee for actual pecuniary loss sustained by his death." If we apply this doctrine to the instant case, it must be seen that the plaintiff has a meritorious case. The following cases seem to support the view we have expressed: *Goff v. Supreme Lodge Royal Achates*, 90 Neb. 578; *Illinois C. R. Co. v. Doherty's Adm'r*, 153 Ky. 363, 155 S. W.

1119; *Daly v. New Jersey Steel & Iron Co.*, 155 Mass. 1;. *Martin v. Modern Woodmen of America*, 111 Ill. App. 99; *McDaniels v. Royle Mining Co.*, 110 Mo. App. 706; *Fitz- gerald v. Union Stock Yards Co.*, 91 Neb. 493; *Welch v. New York, N. H. & H. R. Co.*, 176 Mass. 393; *McCarthy v. Supreme Lodge New England Order of Protection*, 153 Mass. 314; *Houlihan v. Connecticut R. R. Co.*, 164 Mass. 555; *Wilber v. Supreme Lodge New England Order of Pro- tection*, 192 Mass. 477. The plaintiff was clearly depend- ent on the decedent.

Instruction No. 1, requested by the defendant, reads: "You are instructed that, if you find from the evidence the plaintiff, Charlotte H. Richelieu, was able to make her own living at the time of the death of the deceased, Harry E. Richelieu, she cannot recover in this case." It is con- tended by the defendant that it was error to refuse this instruction. We are unable to take that view of the mat- ter. Whether she was dependent upon the brother de- pends upon the aid that he gave her. The evidence shows that he rendered her aid almost continuously.

The defendant should have been permitted to present to the jury its theory of the case. This was in effect denied by the refusal to grant the continuance. For the reasons stated, the judgment of the district court is reversed.

REVERSED AND REMANDED.

REESE, C. J., ROSE and FAWCETT, JJ., dissent.