## ROBERT YOUNG, HERBERT YOUNG, BENJAMIN YOUNG AND YIM KAM YOUNG, MINORS, HONOLULU TRUST COMPANY, LIMITED, A CORPORATION, ADMINISTRATOR OF THE ESTATE OF YOUNG MOW, DECEASED, AND FLORENCE YOUNG v. HONOLULU CONSTRUCTION AND DRAYING COMPANY, LIMITED, AN HAWAIIAN CORPORATION.

### No. 2293.

ARGUED OCTOBER 27, 1937.　　　　　DECIDED JANUARY 21, 1938.

### COKE, C. J., BANKS AND PETERS, JJ.

OPINION OF THE COURT BY PETERS, J.

This is an action for death by a wrongful act of an adult son and brother accorded to dependents by section 4052, R. L. 1935. The text of the section is quoted in the margin.[1] The plaintiffs are the father, four minor brothers and a minor sister of the deceased.

There was a verdict for plaintiffs. Defendant prosecuted error.

The following are the consolidated assignments of error: 1. There was not sufficient evidence of defendant's negligence to submit the case to the jury; 2. The deceased was guilty of contributory negligence as a matter of law which bars plaintiffs' recovery in this case; 3. Plaintiffs failed to adduce more than a scintilla of evidence that they or any of them were dependent on the deceased within the meaning of section 4052, R. L. 1935, and 4. The verdict was excessive.

---

[1]"When the death of a person is caused by the wrongful act or neglect of another, any person who was wholly or partly dependent upon such decedent may maintain an action for damages against the person causing the death, or if such person so liable was then employed by another person who is responsible for his conduct, then also against such employer. Where there is more than one person wholly or partly dependent upon such decedent, any action that may be brought shall be brought by all of such dependents or by one or more of such dependents for the benefit of all the dependents, but only one action may be brought and one recovery had. In every action under this section such damages may be given as under all the circumstances may be just and the trial court shall apportion the damages given among all the dependents. In the action the court shall cause notice to be given of the pendency thereof to all known dependents who have not joined therein. Such action must be commenced within two years after the injury which caused the death; provided, however, that nothing in this section shall be construed as authorizing any action to be maintained hereunder against the employer of such decedent in any case where any dependent of the decedent has a remedy for compensation under the provisions of chapter 245."

No objection was made by defendant in error to any of the assignments of error and in the absence of any objections, defects, if any, therein are deemed to have been waived.

1. In our opinion there was ample evidence of defendant's negligence to submit the case to the jury.

The accident, as a result of which the deceased met his death, was a rear-end collision in broad daylight on Dillingham Boulevard, an arterial urban highway; a Chevrolet truck driven by the deceased coming in collision with a bundle of steel rods projecting from the rear of a stationary truck owned by the defendant, then standing upon the right half of the boulevard, headed in the direction of traffic. The boulevard at the place of the accident is fifty-six feet three inches wide, lies in a generally northwest-southeast direction and to the southeast is a straightaway for a distance of about eight hundred feet.

The truck owned by the defendant and involved in the accident was not described further than it was a five-ton International and when loaded the bed or floor of the body of the truck was fifty inches above the ground. From the photographs taken immediately after the accident it would appear that it is of the larger, if not of the largest type of truck, employed for hauling and designed to carry as well as pull heavy loads. It has steel wheels with large balloon tires. Those in the rear are of the dual type. It has an open body with a driver's cab in front.

The Chevrolet truck that was involved in the accident was also left undescribed further than that it was old and in poor condition and the center of the windshield was about fifty-four to fifty-six inches off the ground. From the same photographs it apparently was a ton or ton and a half truck of the coupe type.

The truck of the defendant while traveling to the northwest on the right half of the boulevard had become

disabled and was standing in a slightly oblique position with its right front and rear wheels fifteen feet eight inches and fifteen feet eleven inches respectively from the right-hand curb. No blame attached to the defendant or its agents or servants in charge of the stalled truck in stopping on the boulevard where it did and remaining there for some thirty minutes up to the time of the accident. It seems that the gears in the differential, through no fault of the defendant or those in charge of the truck, refused to operate, not alone depriving it of all means of self-propulsion but preventing its immediate removal and that all reasonable effort was made to secure a tractor and remove the truck from where it was stalled.

The truck was loaded with three-eighths and half inch reinforcing steel, made up in bundles of thirty-six and forty-foot lengths. Each bundle contained about twenty pieces. These bundles of reinforcing steel had been loaded on the truck in the following manner: On each side of the bed of the truck had been placed twelve-by-twelve timbers or beams slightly shorter than the shortest steel rods and projecting beyond the front and rear of the body of the truck. In front the beams protruded beyond the cab. The bundles of steel rods had been laid lengthwise along the top of the timbers, the longer underneath and both resting directly on the top of the timbers except where two four-by-fours, hereinafter referred to, intervened. Each twelve-by-twelve timber with its superimposed bundles of rods was held in place by chains and vertical wooden staves on the sides of the truck. The bundles of rods were distributed equally between two timbers, the supported mass of rods in each instance being about eight inches high. But whereas on the right-hand timber there were some eight or nine bundles of longer rods, on the left-hand timber there was but one bundle of the longer rods. All of the rods extended beyond the rear end of the timbers on which

they lay, the longer rods below extending proportionately further than the shorter rods above. The shorter rods which extended beyond the rear end of the timbers were almost horizontal while the longer sagged considerably; the former at the ends being seventy inches off the ground, the latter fifty-four to fifty-six inches. The single bundle of longer rods which lay on the bottom of the heap of rods on the timber on the left-hand side of the truck extended beyond the rear of the bed or body of the truck about twelve feet and the rear end of the bundle was twenty-five feet eight inches from the right-hand street curb. Upon the trial a witness indicated with his hands the circumference of this bundle of rods but no actual measurements were preserved in the record. In the opinion of the trial judge on defendant's motion for a new trial this bundle was referred to by him as being three inches in diameter. Otherwise the truck was empty, except for what appears from the photographs to be two four-by-fours resting crosswise upon the twelve-by-twelve beams and caught between the timbers and the steel rods, one above the front end of the body of the truck and the other above the rear end. These four-by-fours apparently were employed to assist in keeping the rods in place.

The defendant's truck was in charge of a driver and a helper and they and a pedestrian were the only eyewitnesses to the accident.

The facts of the accident are not in dispute. The witnesses seem agreed that the deceased approached the rear of the stalled truck from the southeast in the Chevrolet truck, driving on his right-hand side; that the Chevrolet truck came into collision with the bundle of longer rods extending beyond the rear of the stalled truck on the left-hand side as the car was turning to the left; that the Chevrolet, despite the collision, continued for some distance along the left-hand side of the boulevard until it left the

highway and came to rest in adjoining private property to the west. They seem further agreed that the top of the Chevrolet truck was sheared off by the collision and hung impaled upon the shorter rods on the left-hand side and that parts of the car were found scattered about the place of impact. The right-hand post of the windshield was found imbedded in the end of the twelve-by-twelve timber on the left-hand side of the stalled truck. The death of the deceased was instantaneous.

The municipal traffic code in effect at the time of the accident with certain exceptions with which we are not concerned required that whenever the load on any motor vehicle should extend more than four feet beyond the rear of the bed or body thereof there should be displayed at the end of such load in such position as to be clearly visible at all times from the rear of such vehicles a red flag not less than twelve inches both in length and width. Witnesses who had an opportunity of viewing the rear of the stalled truck immediately prior to the accident testified that they did not see a red flag at the rear end of the steel rods. On the other hand there was evidence to the effect that a red flag twelve-by-fifteen inches in size attached to a wooden staff had, earlier in the day and before the truck had started on its journey with its load, been fastened in an upright position to the rear of the single bundle of longer rods on the left-hand side of the truck. There was also evidence to the effect that immediately prior to the accident there was a red flag on the end of the bundle of longer steel rods projecting to the rear of the body of the truck, but none of the witnesses who so testified described the condition of the flag. It was conceded that neither the driver of the stalled truck nor his helper made any personal effort to warn drivers approaching the stalled truck from the rear of the presence of the projecting bundles of steel rods.

Immediately prior to the accident the boulevard was

clear of traffic except for the stalled truck and a third automobile facing in the same direction and parked between the stalled truck and the right-hand curb, obstructing progress from the rear to the right. The driver of the stalled truck was then standing between his stalled truck and the other parked car while his helper was sitting on the left-hand running board of this parked car. The driver testified as a witness for defendant that while standing there he first saw the deceased some two hundred feet away approaching from the southeast on the right-hand side of the boulevard; that the deceased was looking to the side and that when he again looked ahead and saw the stalled truck he seemed confused and turned to the left; that if he had applied his brakes he could have stopped within sufficient distance to avoid the collision but in the opinion of the witness he lost control of his wheel, lost his "head"; and that the deceased was traveling at the rate of about forty miles an hour or more. The helper apparently did not observe the approaching car until his attention was attracted to it by the call of the driver and, looking to the southeast from where he was sitting, saw the Chevrolet truck. According to him his first view of the truck and the collision were practically simultaneous. The assistant manager of the defendant who also qualified as an engineer testified as a witness for defendant that the longer bundle of rods on the left-hand side, with which the car of the deceased came in collision, contained approximately twenty pieces of either three-eighths or one-half inch rods; that after the accident fourteen pieces of the rods in this bundle were bent down to an angle of ninety degrees and that the force of the impact to occasion this must have been "terrific." Another witness for defendant who saw the deceased approach the stalled truck but did not see the accident gave it as his opinion that the deceased was traveling at a "rapid rate of speed." The pedestrian testified that the

deceased was driving at a "moderate" rate of speed. The speed limit at the place of the accident as prescribed by the municipal ordinance was thirty miles an hour.

The accident happened about nine-thirty in the morning. It was a clear day and the road was dry.

Negligence has often been said to be the failure to exercise due care under the circumstances. Due care in turn has been defined as that care which an ordinarily prudent person would have exercised under the same circumstances. So that in the last analysis what is negligence depends upon the facts and circumstances of each individual case, tested by the hypothetical ordinarily prudent man.

The International truck unquestionably was lawfully upon the boulevard. Nor was any negligence attributable to the defendant or its servants or agents in charge of the truck in permitting it to remain on the boulevard. But they were bound to anticipate that other drivers of motor vehicles traveling over the boulevard to the northwest would find it necessary to pass the stalled truck from the rear and to take such reasonable precautions as might be dictated by due care of the rights of others to protect such drivers against the danger to them of the steel rods projecting beyond the rear of the truck. The requirements of the ordinance constituted a sufficient warning to those in charge of the truck that it was dangerous to act other than in accordance with the ordinance. And it was clearly their duty to comply with the ordinance requiring that a red flag be displayed at the end of the load in such position as to be clearly visible at all times from the rear of the vehicle. There is a conflict in the evidence as to whether immediately prior to the accident a red flag was displayed as required by the statute. No less than three witnesses who had an opportunity of observing the rear of the stalled truck prior to the accident testified that they did not see a red flag at the rear end of the steel rods. Four witnesses testified that a red flag

was on the rear end of the bundle of steel rods extending from the left-hand side of the rear of the truck. Both groups of witnesses may have been correct and yet the evidence is susceptible of the inference that the defendant and its agents and servants in charge of the stalled truck had failed to comply with the requirements of the ordinance. It may be true that a red flag attached to a wooden staff had, earlier in the day and before the truck started on its journey, been fastened in an upright position on the rear end of the single bundle of longer rods extending to the rear from the left-hand side of the truck. It may also be true that immediately prior to the accident the red flag was still there. But it may be that there was insufficient wind to cause it to flutter and it hung limp upon its staff. Again, the position of the flag might have changed from that in which it was originally fastened. The staff of the flag might then have been lying against the length of the rod. If so the flag would present no visible area. The flag might even have fouled on the rods. In the event of any of these alternatives the red flag, though "there" was neither "displayed" nor "clearly visible at all times" as contemplated by the ordinance. The ordinance obviously contemplates that there exist at all times adequate warning of the presence of the projecting load and to indicate safe clearance for passing vehicles. Plaintiff in error views the evidence of those who disclaimed seeing the flag as directed solely to the question of the presence or absence of the flag. We view this evidence differently. Had a flag been displayed at the end of the load in such a position as to be "clearly visible at all times" from the rear end of the load these witnesses unquestionably would have seen it. And if, immediately prior to the accident, no flag was "displayed" so that it was "clearly visible" from the rear of the vehicle the cause of the collision and the resulting death of the deceased become apparent.

The requirements of the ordinance have a reasonable and logical relation to the care required of those in control of motor vehicles on public highways, whether the vehicle be in motion or stationary. Common experience teaches us the clearance necessary to successfully pass an ordinary vehicle from the rear whether it be in motion or stationary. The size and bulk of proceeding or stationary vehicles are in themselves sufficient indications of existing physical conditions; but not so with loads projecting beyond the rear of a vehicle. The extent to which loads project from the rear of vehicles is not uniform. The requirements of the statute are intended not only to warn succeeding drivers of the presence of a load extending beyond the rear of the vehicle but also to indicate how far it extends so that proper timely allowance may be made to turn out and clear it while passing. Collision with the bundles of steel rods extending from the rear of the stalled truck was one of the dangers which the ordinance sought to prevent and where, as here, a municipal ordinance prescribes a duty for the protection and safety of others and there is a reasonable and logical connection between the failure to observe the requirements of the ordinance and the omission claimed to have caused the injury, the neglect of duty imposed by the ordinance is evidence of negligence sufficient to require the question of negligence to be submitted to the jury. (*Hayes* v. *Michigan Central R. R. Co.*, 111 U. S. 228, 240.)

2. Defendant in error concedes that the defense of contributory negligence is available to the defendant in this case; similarly as if the deceased had survived his injuries and were plaintiff in an action for damages therefor. The further question remains whether the deceased was guilty of contributory negligence as a matter of law barring plaintiffs' recovery.

It was unquestionably the duty of the deceased while operating a motor vehicle over and along the boulevard to

exercise due care to protect himself from injury. Ordinarily it may be said that there is no essential difference between the test of due care when for want of observance of which the defendant may be responsible and the test of due care for the failure to exercise which the plaintiff may be barred from recovery. And here, in judging the conduct of the deceased, similarly as in the case of the defendant and its agents and servants, due care turns upon what the ordinarily careful and prudent man would have done under the same circumstances. No evidence developed upon the plaintiffs' case showing lack of due care on the part of the deceased. The evidence adduced by the defendant has already been referred to. It is upon the comparative physical conditions existing immediately prior and subsequent to the accident, upon the facts and circumstances of the accident and upon the evidence adduced by it that it contends the deceased was guilty of contributory negligence barring recovery.

Ordinarily in cases of this kind the question of contributory negligence is one of fact for the jury. Assuming the evidence offered by the defendant to be true, together with all the inferences of which the same is capable, we cannot say as a matter of law that the deceased was guilty of contributory negligence and that the denial of the motion for a directed verdict was error. For " 'if any possible hypothesis based on the evidence forbids the imputation of fault to the deceased, as matter of law, the question is for the jury.' Chamberlain v. Lehigh Valley R. R. Co., 238 N. Y. 233, 144 N. E. 512." *Davis* v. *New York State Rys.*, 206 N. Y. S. 138. (*Nicholson* v. *Greeley Square Hotel Co.*, 227 N. Y. 345, 349, 125 N. E. 541.)

Were this case one of collision between the truck of the deceased and the stalled truck of the defendant, failure on the part of the deceased to clear the truck would be well-nigh inexplicable. But this is not such a collision. It is a

collision between a motor vehicle and steel reinforcing rods extending beyond the rear end of the body of the stationary truck which the former was attempting to pass. The Chevrolet never came into collision with the International truck. It cleared the truck. It was the bundle of steel rods projecting from the rear of the truck on the left-hand side with which it came in collision.

Common experience teaches us that at a certain distance a load extending from the rear of a truck merges in the body of the truck and to all appearances, even on a clear day, the rear end of the load is coterminus with the rear end of the truck. In other words, at a certain distance in the absence of a clearly visible red flag or other adequate warning there would be nothing to indicate to one approaching from the rear the existence of a load extending beyond the rear of a stalled truck. Obviously there is a distance within which on a clear day the outlines of a load extending beyond the rear of a stationary truck would become sufficiently clear so that a driver of a motor vehicle approaching from the rear would, if he maintained a proper lookout, see the load. And it must be equally obvious that it would then only become a question of degree when the extent to which the load extended beyond the rear of the truck would also become apparent. There is no direct evidence in the record from which one might determine at what distance in the absence of warning to indicate its presence or extent a bundle of steel rods extending from the rear of a truck on the left-hand side would be distinguishable to a driver in the exercise of due care approaching from the rear or at what distance the extent to which it so extended would also become apparent. A person is not required to regulate his conduct with reference to facts of which he is justifiably ignorant. Until the bundle of steel rods extending from the rear of the truck on the left-hand side became distinguishable, the deceased had a right to assume, while exercising

due care, that he was not exposed to any danger, ignorance of which would result only from the breach of a statutory duty. Under the circumstances when may it be said that the deceased, had he not been guilty of negligence in the particulars attributed to him would, in the exercise of due care, have seen the bundle of steel rods and have safely cleared them instead of driving to his death. The momentary diversion referred to by the driver of the stalled truck occurred when the deceased was some two hundred feet away. Was not the question of whether an ordinarily careful and prudent man under the circumstances would have permitted his attention to be momentarily diverted a question for the jury? We think so. To look to the side while driving a motor vehicle is not without exception negligent under all circumstances. The further question of whether or not the deceased was traveling at a rate of speed in excess of the speed limited by law or at a speed in excess of that warranted by existing conditions was also a question for the jury. Upon what evidence may it be said as a matter of law that the deceased was traveling at an unlawful rate of speed or at a speed that might be considered negligent in view of the existing conditions? It is true that the comparative physical conditions existing immediately prior and subsequent to the accident and the facts and circumstances of the accident go to show that the deceased was traveling at a high rate of speed. But thirty miles an hour is a high rate of speed. It cannot be said that the resulting damage is consistent with a speed of thirty miles per hour and inconsistent with speed in excess of that rate. The comparative opinions of speed given in evidence are of no assistance. Such evidence has but little weight in the law. Again, take the evidence of the truck driver that the deceased was traveling at about forty miles an hour or more. This was but his opinion. He gave no reasons for it. He was not corroborated further than it might be said that the comparative opinions of speed and

physical results of the collision constituted corroboration. The weight of opinion evidence is primarily for the jury and in instances such as this where speed is involved opinion evidence is not binding upon the jury. No more so is it binding upon the court when considering a motion for a directed verdict. Whether the deceased was traveling at a rate of speed in excess of what ordinary prudence permitted under the circumstances was a question of fact for the determination of the jury. It would have constituted a clear invasion of its prerogatives had the trial court determined this question as a matter of law or had withdrawn from the jury the issue whether the deceased at that time was guilty of a violation of the traffic ordinance in operating his car at a speed in excess of that limited by law. (*Wichita Falls & S. R. Co.* v. *Holbrook,* 50 S. W. [2d] [Tex. Civ. App.] 428, 436.) The danger to the deceased lurked in physical conditions admitting of variable visibility. Distance, light, the surface the rods presented to view, the background of the truck—these and many other considerations necessarily affected visibility. The distance within which conditions might become apparent and the danger involved might be appreciated was as variable as the elements affecting it. That the deceased seemed confused was natural but it was apparently engendered by the situation in which he found himself and was not confusion resulting from inexperience or absence of control. By reason of the presence of the third car parked at the right-hand curb he was unable to pass to the right. The highway to the left was clear. He swerved to the left and but for the presence of the bundle of steel rods that caused his death he would have successfully passed the stalled truck on its left-hand side. The statement of the driver that the deceased, had he applied his brakes, could have avoided the collision was but his opinion in the light of the knowledge possessed by him of existing physical conditions, but that is not the test. The conduct

of the deceased may only be measured by what an ordinarily careful and prudent man, possessed of knowledge of the existing physical conditions which such a man would have possessed had he exercised due care, would have done under the circumstances. (*Ikeda* v. *Hoe Lung,* 14 Haw. 520.) A possible hypothesis is that the deceased was traveling over the boulevard within the limit permitted by the law; that in the absence of a red flag indicating the presence of a load extending from the rear of the vehicle, the stalled truck merely presented the appearance of a stationary vehicle; that in the absence of any appearance of danger he approached the stalled truck without diminishing his speed and when he arrived at a point to the rear of the stalled truck when the load was distinguishable from the truck proper it was too late to turn out without coming into collision with the bundle of steel rods projecting from the left-hand side of the stalled truck or seeing the rods he miscalculated the extent to which they extended to the rear of the left-hand side of the truck, misgauged the clearance and collided with the rods. Either of these hypotheses is based on the evidence; they are consistent with due care and under the law forbid the imputation of fault to the deceased as a matter of law.

Not alone was the evidence offered of a character upon which reasonable men might differ but the evidence in itself was amply sufficient to sustain a verdict absolving the deceased from contributory negligence. The weight to be attached to comparative opinions upon the speed at which vehicles travel has had the previous attention of this court in *Dong Chong* v. *Rapid Transit Co.,* 16 Haw. 272. The evidence of the truck driver as to the speed at which the deceased was traveling has been disposed of. Nor was his opinion upon how the collision might have been avoided binding upon the jury. Moreover the evidence of the driver may have been disbelieved by the jury. The driver was an

interested witness. His incentive to exonerate himself from blame goes to the weight and credibility of his evidence. Employees of a party, especially in actions against the latter for the negligence of his servants, although not affected by the verdict pecuniarily, are by the great weight of authority deemed interested witnesses. Their incentive to exonerate themselves from blame goes to their credit and should be carefully considered in weighing their testimony. (70 C. J., T. Witnesses, § 1154, p. 951; *Mobile Light & Railway Co.* v. *Davis,* 1 Ala. App. 338, 55 So. 1020, 1022.) If the evidence of the driver were disregarded the case would resolve itself into one in which all imputation of lack of due care would be removed and the presumption of due care could be legitimately substituted.

A further consideration militates against the contention that the case should have been taken from the jury upon the ground of contributory negligence. To defeat recovery not alone must the deceased have been negligent but his negligence, if any, must have contributed as a direct and proximate cause of his injury. Where, as here, there is evidence sufficient to sustain a finding of negligence on the part of the defendant it cannot be said, as a matter of law, that the negligence of the deceased, if any, was such contributory negligence as should preclude the plaintiffs from recovery. (*Dong Chong* v. *Rapid Transit Co., supra.*) The issue of proximate cause was a question of fact and was rightfully committed to the determination of the jury. "Where one of two or more acts of negligence may be the proximate cause of an injury, or where there is any doubt as to the proximate cause, the question is to be left to the jury." *Hughes* v. *McGregor,* 23 Haw. 156. (*Ikeda* v. *Hoe Lung, supra,* and cases cited.)

3. Did the plaintiffs fail to adduce more than a scintilla of evidence that they or any of them were dependent on the deceased within the meaning of section 4052, R. L. 1935?

In our opinion this question must be answered in the affirmative. The right of action created by the statute is not one accorded generally for damages resulting from death by a wrongful act. It is a cause of action created for the benefit of dependents and to sustain a recovery it must affirmatively appear that those invoking the statute are wholly or partially dependent on the deceased for their support. The term "dependent" has been variously construed. But as employed in death acts it connotes the existence of necessitous want. (*Richelieu* v. *Union P. R. Co.,* 97 Neb. 360, 149 N. W. 772, 774; *Moffett* v. *Baltimore & O. R. Co.,* 220 Fed. 39; *Atchison T. & S. F. Ry. Co.* v. *Hopkins,* 24 Ariz. 103, 207 Pac. 66, 69; *Duval* v. *Hunt,* 34 Fla. 85, 15 So. 876, 881; *Southern Railway Co.* v. *Vessell,* 192 Ala. 440, 68 So. 336; *Bortle* v. *Northern Pac. R. Co.,* 60 Wash. 552, 111 Pac. 788.) And in our opinion the term is used in that sense in section 4052.

Dependency may result from different causes. It may result from the lack of physical necessities such as food, shelter and clothing. It may result from moral and social necessities such as education. Physical, moral and social necessities are not confined to the subjects mentioned. Others are readily conceivable. But it is to those mentioned to which under the record this inquiry is confined.

It does not appear that the plaintiffs, or any of them, were at any time dependent upon the deceased for physical necessities or education or that any one contributed to their support or education except for contributions of personal services and money claimed to have been made by the deceased to the family generally and to different members thereof in particular during his incumbency as "manager" of his father's business.

The only evidence in support of the claim of dependency was that the family, including the deceased, lived together on certain premises leased and operated by the father;

that the father's sole source of income and means of support of himself and his family and the education of his minor children were the net proceeds of sale of fish, sea salt and poultry eggs produced on the leased premises; that the father, due to advanced age or illness or both, had withdrawn from active participation in the conduct of the business and the deceased had, under the father's supervision, undertaken the active end of the business, personally attending to the sale and delivery of the produce of the leased premises, keeping the accounts and making collections as the result of which the gross proceeds of the business had been increased twofold; that during this same time the deceased gave to his sister and to those of his brothers who were attending school money for school expenses, clothes and other purposes but that this money had been secured by him from their father and that upon the death of the deceased the gross proceeds of the business having declined to almost its former amount the surviving sister and the oldest surviving brother were compelled to quit school due to the inability of their father to furnish them with the necessary money.

First as to the alleged dependency of the plaintiffs or any of them for physical necessities. The deceased, at the time of his death in May, 1934, was twenty-one years of age. He was survived by his parents, a sister and four brothers. His father was sixty years of age, the sister between nineteen and twenty, the oldest surviving brother between eighteen and nineteen and the other three brothers sixteen, thirteen and four years of age respectively. It appears that the father immigrated to this country from China some thirty-eight years ago and later became interested in the fish and salt business, leasing, with others, a fish pond and salt beds at Moanalua. The lease at first was for a fifteen-year term and later was renewed at five-year intervals. The last term was for six and a half years from October, 1933.

The father had been engaged in this business prior to his son's death for about thirty years, at first with partners and for the last six years alone. He seems to have prospered. He constructed a home on the demised premises for himself and his family out of his own moneys and in the course of time bought out the interests of his two remaining partners in the equipment of business for the sum of $1900. He apparently was not alone able to support his large family but to make liberal provision for their education. His net income was approximately a thousand dollars a year. With the advent of the son the gross income of the business was increased from $150 a month to $300 a month.

From this evidence it is apparent that the net proceeds of the business were amply sufficient for the support of the family and that at no time were any of the plaintiffs dependent upon the deceased, measured by their physical necessities according to their circumstances and station in life. As far as we know they enjoyed all the physical comforts of life consistent with their means and according to the manner in which they were accustomed to live. It does not appear that they were ever in physical want nor does it appear that they were ever given assistance further than it is claimed that the deceased assisted them by the contribution of his personal services and the gifts of money to the other children. With this exception the only conclusion of which the evidence is capable is that the net proceeds of the business conducted by the father, though not large, were at all times amply sufficient to support himself and his family in the manner in which they were accustomed to live and that to the extent that the deceased contributed personal services and money, if he did so contribute, such contributions merely marked an abundance of what theretofore existed in plenty.

In order to establish dependency it is not sufficient merely to show that contributions of services or money were

made but it must also appear that such contributions were wholly or partially by way of relief of necessities. (*Bortle* v. *Northern Pac. R. Co., supra.*) From all that appears the means of support had previously been ample. With the advent of the eldest son the gross proceeds of the business had admittedly been increased. No doubt this resulted in additional income and made possible many physical comforts that the members of the family had not previously enjoyed. But it is not modesty of support but its absence in whole or in part that determines dependency. From the fact that the proceeds of the business declined after the death of the deceased it does not necessarily follow that in the absence of contributions of personal services or of money by the eldest son the family would have been thereby deprived of necessities. Assuming the truth of the statement that after the death of the deceased the gross income of the business declined to $175 it does not necessarily follow that had the monthly gross income not been increased the former gross income would have been insufficient to support the family and it would have been reduced to necessitous circumstances. Upon his asserting dependency rests the burden of proving it. Dependency must be shown and proved like any other fact. (*Smith* v. *Pryor,* 195 Mo. App. 259, 190 S. W. 69.)

But even assuming that the contributions attributed to the deceased had been made as claimed it does not appear whether the personal services rendered by the deceased were gratuitous or for hire or whether the money given by him to his sister and brothers for school expenses, clothes and other purposes was the money of the deceased or that of his father. It is the theory of plaintiffs that the business conducted by the father was his sole source of income; that the personal services rendered by the deceased prior to his death were gratuitous and to the extent of their value constituted a contribution by him to the support of the family.

The evidence, however, does not sustain the contention. The record is absolutely silent as to the circumstances under which the deceased undertook to assist his father in the conduct of the latter's business. It does not appear whether the deceased went to work for his father pursuant to a contract or stipulation of employment including wages or whether his services were gratuitous. In other words the relation of master and servant may have existed. If the son were in receipt of wages for the personal services rendered by him obviously such services were not gratuitously contributed but on the contrary were performed for hire. This matter having been left in doubt we cannot say as a matter of law that the personal services rendered by the deceased were contributed by him by way of support of his parents and other members of the family. The same situation exists in respect to the alleged gifts of money by the deceased to his sister and brothers. The evidence upon this subject is quoted in the margin.[1] As far as the record is concerned it

---

[1] (Young Mow, the father of the deceased, direct examination, tr. p. 56.)

"Q  You are, are you not, the father of Daniel Young, for whose death we are bringing this action?

A  Yes.

Q  How old was your son at the time of his death?

A  About 23 years old.

Q  What was he doing at the time of his death; what business was he carrying on?

A  He was graduated from high school in 1931. Because I am old he took charge of my business.

Q  Yes?      A  The business of fishpond and salt.

Q  Exactly what was he doing in connection with this business?

A  He was managing my business; he attended to the buying and selling. * * *

Q  The moneys this boy of yours would make in the business, would he take charge of those or what would he do with those moneys?

A  All the money that he had collected he would turn in to me.

Q  Who spent the moneys, who handed out the moneys?

A  *I used the money to pay rent and family expenses.*" (p. 57) "* * *

Q  Did you pay rent to somebody for your fishpond out there?

A  Yes.

does not appear whether the deceased in securing from their father and in turn paying to his sister and brothers money for school expenses, clothes and other purposes, was acting independently or as the mutual agent of the parties. Moreover if the money was that of the father obviously the claim that the deceased personally made these contributions fails. In our opinion the only reasonable inference of which this evidence is capable is that the father was performing his statutory duty to support and educate his children through the agency of his eldest son and that the latter was acting as an intermediary or as the mutual agent of the parties and that the money contributed by him was the money of the father and not the money of the son and that the latter was merely the conduit of physical delivery. Before the deceased went to work for his father the latter had always supported his children and provided for their education, including that of the deceased. It is reasonable to suppose that he continued

Q  The rent was the same before and after the boy took charge?

A  Yes.

Q  And the money that was made, was made from fish taken out of this pond that was rented and from salt taken out of the water there, is that right?

A  Yes. * * *

Q  Now Mr. Young Mow I am going to ask you, by the time your son died, what had the earnings and income of that business under his management become?

A  He made about $300 gross a month." (tr. 62.) " * * *

Q  Out of which you had to pay the rent, is that right?

A  Yes.

Q  The children's expenses, family expenses and everything. Since your son has died, and under whatever management you have out there now, what has become the income of that property? * * *

A  About $175 a month since his death." (tr. 63.)

(Redirect examination)

"Q  This money you have spoken of as being taken in from this business after you had bought out the partners, *was that money used for the care and maintenance of the whole family, all these children that are suing in this case?*

A  Yes." (tr. 70.)

to do so through the agency of his eldest son. The deceased, as far as we know, had no independent source of income and unless he was in receipt of wages, which the plaintiffs in effect deny, he had no means of providing the school expenses, clothes or other personal needs of his sister and brothers. All the proceeds of the business were turned over to the father. As far as we know he was the only one in the family possessed of the ability to support and educate his children. It is more reasonable to assume that the father, who had the means of performance, was observing his statutory duty to support and educate his children than that he was neglecting that duty and imposing it upon his eldest son.

Next as to whether or not the sister and oldest brother were dependent upon the deceased for their education.

There is evidence to the effect that after the death of the deceased the oldest surviving brother quit school and went to work for his father; that his surviving sister also left school and for some nine months remained at home, finally, three months prior to the trial of the within cause, securing

(Robert Young, oldest surviving brother, direct examination.)

"Q   You lived out there at Moanalua?            A   Yes.
Q   Have you?                                     A   Yes.
Q   With your father and mother?                  A   Yes.
Q   And brothers and sister?                      A   Yes.
Q   Mr. Young, during your brother's lifetime and before, just before he died, did he give you moneys for any purposes?
A   Yes, for school expense.
Q   I beg pardon?              A   For school expense.
Q   Was he the one who handed you money to use in school?
A   Yes.
Q   Did you have books to buy and that sort of thing?
A   Yes.
Q   Where did you get your money for that purpose?
A   I always ask my brother.
Q   What about your clothing?
A   Always from my brother.
Q   In other words, you got the money from your brother for all purposes, is that right?
A   Yes." (tr. 71, 72.)

work. The mother survived the deceased by but a few months and the inference is that the daughter remained at home, at first taking care of her mother during the latter's illness and after she had passed away taking the mother's place in the household. It also appears that at the time of her brother's death the sister was attending a local business college taking bookkeeping, stenography and type-writing and the oldest surviving brother was a junior in the high school. The record is silent as to the earlier education of the sister but it is reasonable to assume that she had previously completed the necessary preliminary education and was attending business college to qualify herself for commercial employment. It appears in evidence that the oldest surviving son had attended a junior high school. The father testified that after his eldest son's death he was unable to

---

(Cross-examination.)

"Q When you said your brother always gave out money, you meant *your brother gave out money he got from operation of your father's business, is that not correct?*

A Yes.

Q In other words, all of the cash that was derived from this business was handled by your brother in his lifetime, he handled the money, did he not?

A He did not handle the money, *I seen him ask my father, he ask my father, get the money.*

Q O, I see, the old gentleman handled the cash?

A Yes.

Q You asked your brother?      A Yes.

Q Your brother asked your father?      A Yes.

Q Your father would give it to your brother?      A Yes.

Q And your brother would give it to you?      A Yes.

Q That is the way you were supported for clothing and whatever necessary expenses you had?

A Yes.

Q Going to school. Is that the same way your sister was taken care of?

A Yes.

Q And your other brothers?      A Yes.

Q They all got the money from your oldest brother?

A Yes.

Q Who in turn, got it from your father?      A Yes." (tr. 77, 78.)

afford further schooling for his daughter and his eldest surviving son. It does not appear that any of the other children were similarly affected. They, as far as we know, continued at school.

What has already been said upon the failure of plaintiffs to show that they, or any of them, were dependent upon the deceased either in whole or in part for physical necessities applies with equal force to the claim of the sister and oldest surviving brother that they were dependent upon the deceased for their education. And even if we were able to say that they made out a case of dependency in that regard the evidence further fails to show any pecuniary loss suffered by them by reason of being deprived of further education.

When dependency is shown the damages recoverable are those only that are compensatory of the pecuniary loss directly and proximately resulting from the wrongful act.

(Redirect examination.)

"Q  What do you mean when you say the money came from your father to your brother? What do you mean by that? How do you——

A  *My brother he sells this thing and when he get the money he give it to my father.*

Q  Took charge?          A  My father took charge. When I like the money I always go to my brother.

Q  So that your father held the money that your brother would get from the business?

A  Yes.

Q  *Is that what you mean, when he wanted any he would go and get it and give it to you or anybody else?*

A  Yes." (tr. 78, 79.)

(Florence Young, sister, direct examination.)

"Q  What school?          A  Hawaii Commercial College.

Q  What were you studying there?

A  Bookkeeping and shorthand, typing and office work.

Q  Had you finished your course there?

A  No, I did not.

Q  I beg pardon?          A  I did not.

Q  You did not?          A  No.

Q  How much longer did you have to study to finish the course there?

A  About one year.

As said previously in *Enos* v. *Motor Coach Co., ante,* 5, 7: "The damages awarded must be compensatory and must be confined to compensation for the pecuniary loss suffered by the dependents." This pecuniary loss is measured by the pecuniary benefits that the dependent might reasonably have expected to receive from the deceased had he lived. "The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased." *Ches. & Ohio Ry.* v. *Kelly,* 241 U. S. 485, 489. This is not the case of an action for wrongful death of one to whom the plaintiffs had a legal right to look to for his or her education. The damages, if any, accruing to the sister and oldest surviving brother consist only in the loss of a prospective benefit to which they were not legally entitled. "The rule for the measurement of damages must differ according to the relation between the parties plaintiff

Q  What did you do, about that school business, when your brother died?
A  I was studying at school.
Q  What happened when your brother died?
A  O, upon my brother's death I stayed home.
Q  You stayed home; and have you been to school since your brother's death?
A  No.
Q  What are you doing now?    A  Now I am working.
Q  I beg pardon?    A  I am working now.
Q  Where?    A  Hawaii Products.
Q  What do you do?
A  Just selling vegetables.
Q  Clerking, selling vegetables. When you wanted money, where did you get it, when your brother was alive?
A  Get it from my brother.
Q  He paid your expenses?    A  Yes.
Q  Did you see this process of being taken from your father who had custody of it, by your brother, and handed to you; do you know anything about that?
A  No, when I needed money I go to my brother and my brother take from his pocket, give it to me.
Q  Where he got it you do not know? [question unanswered.]
    That is all." (tr. 81, 82.)

and the decedent, 'according as the action is brought for the benefit of the husband, wife, minor child or parent of minor child, for the loss of services or support to which the beneficiary was legally entitled, or is brought for the benefit of a person whose damages consist only in the loss of a prospective benefit to which he was not legally entitled.' Tiffany, Death by Wrongful Act, §§ 158, 160, 161, 162." *Mich. Cent. R. R.* v. *Vreeland,* 227 U. S. 59, 72. And although judgment may be for a gross amount the interest of each beneficiary must be measured by his or her individual pecuniary loss. (*Gulf, Colorado etc. Ry. Co.* v. *McGinnis,* 228 U. S. 173, 176.) Moreover it is the present value and not the aggregate of the expected future contributions that is the measure of pecuniary loss. (*Ches. & Ohio Ry.* v. *Kelly, supra.*) Hence it may be said in the case of loss of anticipated education the pecuniary loss suffered is the present value of the aggregate of the contributions that might have been reasonably expected for that purpose if the deceased had lived. Obviously there is no hard and fast rule. More than ordinary discretion should be allowed the jury. It would be competent for the jury to consider the "degree or spirit in which the deceased responded to his obligation to contribute," the "likelihood of * * * increased income of the deceased," his "health, habits, morals, social adaptability, and possible other facts and circumstances," indicating the continuance or increase of contributions in the future. *Cudahy Packing Co.* v. *Ellis,* 105 Fla. 186, 140 So. 918, 919. But the record is absolutely lacking in the essentials from which the jury could compute pecuniary loss, if any, suffered by the sister and oldest surviving brother. There is no evidence as to the extent to which they expected to continue in school after the death of their brother nor what they might have reasonably expected in the way of contribution. There is no evidence as to the amount, value or extent that the deceased had contributed to their education in the past.

"The jury must have a reasonable basis of facts upon which to compute the damage and it is the duty of plaintiff to supply those facts." *Smith* v. *Pryor, supra.*

Under the circumstances the plaintiffs wholly failed to make out a case entitling them to recover; this assignment of error must be sustained and the cause remanded for a new trial.

There are other considerations, however, vital to the case of the sister and surviving brother upon which there was no evidence and upon which, in the event of a new trial, evidence may become necessary. The record contains nothing upon which a finding may be predicated that the education of the sister and of the oldest surviving brother to which it is claimed the deceased contributed during his lifetime were, in either case, a necessity.

The term necessity is a relative one. As said by the court in the case of *Breed* v. *Judd,* 1 Gray (Mass.) 455, 458, "It would be difficult to lay down any general rule upon this subject, and to say what would or would not be necessaries. It is a flexible, and not an absolute term, having relation to the infant's condition in life, to the habits and pursuits of the place in which, and the people among whom he lives, and to the changes in those habits and pursuits occurring in the progress of society." When used in connection with the education of minors its application becomes, by reason of additional considerations, increasingly complex. In *Middlebury College* v. *Chandler,* 16 Vt. 683, 686, the court said : "The practical meaning of the term [necessary] has always been in some measure relative, having reference as well to what may be called the conventional necessities of others in the same walks of life with the infant, as to his own pecuniary condition and other circumstances." In *Streitwolf* v. *Streitwolf,* 58 N. J. Eq. 570, 43 Atl. 904, the court said : "The necessity that is the criterion of validity is not mere physical necessity, but rather social and moral pro-

priety, having regard to the situation of the parties and the fitness of things. * * * In an enlightened community the common education of a child is a moral and social necessity." This court, in *Kennedy* v. *Sniffen,* 23 Haw. 115, at page 118, said: "Board, lodging, clothing and expenses incidental to the education of the child were necessaries, and for the value thereof, not in excess of what was reasonable for the child considering her station in life, a claim could be made against the estate."

The cases cited, however, take into consideration an element that does not exist where complete or partial dependency is claimed and that is the admitted pecuniary ability of the person or persons upon whom rests the statutory duty to educate the minor. Where a minor claims that he or she is dependent in whole or in part for his or her education upon another not legally bound to provide the same it presupposes that the person upon whom rests the legal duty to educate is financially unable in whole or in part to conform to such duty. Obviously the ability of parents to educate their minor children and the extent to which the latter must rely upon others for their education are impelling considerations in determining the extent to which such education should be continued.

A court of competent jurisdiction might unquestionably, from facts of common knowledge and of which it might take judicial notice, find as a matter of law the extent to which the education of a minor dependent is a necessity, without which, in the words of the *Middlebury* case the minor "would lack an acquisition which would be common among his associates, * * * would suffer in his subsequent influence and usefulness in society, and would ever be liable to suffer in his transactions of business * * * [lack] an education * * * essential to the intelligent discharge of civil, political, and religious duties." (p. 686.) Such an education is therein referred to as a "good common school education."

And it would be unreasonable to apply to a dependent minor any different rule of necessity than would be applied to any other minor similarly situated. But what would be considered a good common school education in Hawaii? The answer to this question in a large degree depends upon many general considerations, not the least of which are the provisions made by the Territory for free schools, the curricula offered by them, especially in the high schools, the character of the community in which the child lives, the predominating industries, the average age when children become self-supporting. The local compulsory school law is also a consideration. It is significant that the legislature of the Territory has fixed the compulsory school age from six to sixteen. Prior to the amendment of 1937 it was six to fourteen. (R. L. 1935, § 745, Am. L. 1937, Act 190, sr. A-25.) Allowing for the ordinary setbacks that might be reasonably expected in the case of the ordinary normal child it will have progressed through the ninth grade by the time he or she arrives at the age of sixteen, in other words, through the junior high school. And a court of competent jurisdiction might, therefore, without any evidence on the subject but relying entirely upon its judicial knowledge, conclude with some degree of assurance as a matter of law, that a good common school education in Hawaii is through the junior high school. To what degree its judicial knowledge might lead it in determining the extent to which the education of a dependent minor might be continued as a necessity we do not pretend to say. An expression of what it considered a good common school education in Hawaii would more properly come from the judge presiding at the trial.

There may be, however, facts not of common knowledge and not such of which the court may take judicial notice from which tryers of fact might conclude that the extent of a common school education in Hawaii includes some or all

of the grades of the public schools beyond those included in what might be considered by the court from its judicial knowledge a good common school education in Hawaii. In other words an education including some or all of the three grades of the senior high school or its equivalent. And if such be the fact then the further education of a minor to that extent may be a legal necessity.

But whatever the extent of a common school education a minor is not foreclosed from insisting that in his or her particular case education beyond and in addition to a common school education is a necessity. As stated in 14 R. C. L. at page 258: "Some kind of education has been included from early times within the class of necessaries for which an infant may contract. The early cases, however, seem to have confined this to elementary or vocational education, and even in the later cases, a college, university or professional education has generally been excluded; though it has been judicially suggested that it might be allowed in a case where the infant's ability and prospects justify it." In the *Middlebury* case, *supra,* the court said: "It does not appear that extraneous circumstances existed in the defendant's case, such as wealth, or station in society, *or that he exhibited peculiar indications of genius or talents,* which would suggest the fitness and expediency of a college education for him, more than for the generality of youth in the community." (Italics supplied.) In the case of *Cory* v. *Cook,* 24 R. I. 421, 53 Atl. 315, the court said: "We do not agree with the contention of plaintiff's counsel that, simply because the State, through its public school system, furnishes the facilities for *a common school education,* the father cannot be held liable for anything in the way of supplemental or additional training for the child. This must also be left to depend upon the circumstances of the case." (Italics supplied.)

In the case of *Esteb* v. *Esteb,* 138 Wash. 174, 244 Pac.

264, the court, in determining that a college education in the case of a minor was a necessity, took into consideration that the minor was majoring in English with the intention of becoming a teacher thereof; that she was especially adapted for that sort of work; that she finished a regular four-year course in two and one-half years; that she showed special aptitude for the class of work she was doing, receiving excellent grades and in justification of its conclusion said: "We have never been called upon to decide this precise question before. If the court has this legal right, it must be upon the ground that the same is necessary, for the duty of a father to provide for his minor child when the custody be in another is restricted to necessaries. From earliest times the question of what is a 'necessary' has frequently perplexed the courts. Under practically all the authorities those things are necessary which include shelter, food, clothing and medical attendance, together with an education. * * * As to the amount of education that should be considered necessary, courts have never laid down a hard and fast rule. * * * Applying the rule as stated by the courts and the text-writers, it will be seen that the question of what sort of an education is necessary, being a relative one, the court should determine this in a proper case from all the facts and circumstances. Nor should the court be restricted to the station of the minor in society, but should, in determining this fact, take into consideration the progress of society, and the attendant requirements upon the citizens of today. * * * It seems to be contended that the minor in this case should be content with a commercial education, and it is argued that since she is a graduate of the Lincoln high school that fact demonstrates that she is able to earn her own living, and should no longer be a charge upon her father. But the record discloses that she has no aptitude for commercial work. It also appears that she completed her high school course in a little more than one-half the time

usually taken, because of her genius for that class of work. It would seem, then, that she is not only unsuited for commercial life, but that she is exceptionally well-fitted for her chosen vocation."

Section 4052, *supra,* places no age limitation upon dependency. So that were the term "necessity" as a connotation of the term "dependency" given its broader significance and construed in the light of the objects and purposes sought by the statute instead of restricting it to its legal definition when used in connection with the relation of parent and child many of our observations upon the necessity of continued education of a minor would equally apply to the continued education of an adult. And it might reasonably be said that the education of an adult may, under certain circumstances, consistently with dependency, constitute a necessitous want and that he or she may, to the extent of such continued education, be dependent within the meaning of the statute. A case in point is that of *City of Rome,* 48 F. (2d) 333, 340, where an adult student at the university who was partially dependent upon her brother for her expenses was granted an allowance as a "dependent relative" under the Act of Congress of March 30, 1920, c. 111, § 1, 41 Stat. 537, 46 USCA § 761.

4. We deem comment upon the amount of the verdict to be unnecessary.

The judgment appealed from is accordingly reversed and the cause remanded for a new trial.

*W. B. Lymer* (also on the briefs) for plaintiffs.

*J. G. Anthony* (*Robertson & Castle* on the briefs) for defendant.